IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


STEVEN M VIOLETTA,
          Plaintiff,

       vs.                                No. 16-1193-JTM

STEVEN BROS. SPORTS MGMT, LLC.,
      *et al.*,
          Defendants.


MEMORANDUM AND ORDER


Plaintiff Steven Violetta was hired in 2015 to turn around the performance of three minor league hockey teams. Some six months later, he was terminated for poor performance, and brought suit against his employer, its owners, and other related companies, raising claims of breach of contract, violation of COBRA and ERISA obligations, violation of the Kansas Wage Protection Act (KWPA), and age discrimination. The matter is now before the court on the parties' cross-motions for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.

*McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Here, in addition to the competing motions for summary judgment, defendants have moved to strike the declaration (Exhibit K) of the plaintiff which is attached to his reply (Dkt. 145). A centerpiece of the defendants' arguments in their earlier pleadings was that the initial versions of the Violetta affidavits (Exhibits A and B) were unsworn. They argue that attaching the sworn statement is "in effect" making new arguments in his reply. (Dkt. 147, at 3). Further, they argue that the sworn statement is still insufficient and "worthless," and "the Court must utilize its discretion [to] strike Plaintiff's [declaration]."

The motion to strike is denied. As defendants acknowledge, whether to strike a declaration rests within the discretion of the court. The circumstances of the case do not warrant striking the new declaration. First, the court notes that defendants fail to make any demonstration that Exhibit K differs in any meaningful way as to the underlying facts asserted. Accordingly, Exhibit K does not raise new arguments, it simply provides evidentiary support for plaintiff's contentions.

The court also rejects defendants' arguments plaintiff failed to support his factual contentions. In Exhibit K, Violetta "declare[s] under penalty of perjury" that the statements in Exhibits A and B "are incorporated [into Exhibit K], are based on my own personal knowledge, and are true and correct." The court finds that the declaration is sufficient to support plaintiff's factual contentions.

Of course, the court does not encourage such belated documentation, and counsel for plaintiff is admonished to comply with proper procedure in the future. Nonetheless,

while defendants have indeed attacked the original affidavits as unsworn, they have not articulated any particular prejudice from that failure, nor otherwise sought leave to supplement their evidentiary responses to plaintiff's factual claims. Under all the circumstances of the case, the court finds no reason to strike plaintiff's declaration, or to defer a determination as to the uncontroverted facts in the action.

Violetta has worked in professional sports management and marketing since 1993. During his 25-year career he has held a number of positions with National Hockey League teams, including the Pittsburg Penguins (Vice President of Marketing and Sales), the Ottawa Senators (Executive V.P. and Chief Marketing Officer), the Nashville Predators (Executive V.P of Business Affairs), and the Detroit Red Wings (Senior V.P. of Business Affairs). He has also worked for baseball's San Diego Padres (Executive V.P. for Business Affairs) and the minor league Staten Island Yankees (CEO).

Nine months after his termination by SBSM, Violetta was hired as Vice President of Corporate Partnerships, Sales, and Service for the Edmonton Oilers of the NHL. He remains in that position today.

Steven Brothers Sports Management, LLC ("SBSM") is a Kansas limited liability corporation with its principal place of business in Kansas. Steven Brothers Sports Management of Allen, LLC ("SBSM-A") was a Texas limited liability corporation with its principal places of business in Kansas and Texas.

Brandon Steven, Rodney Steven, and Johnny Steven, individuals residing in Kansas, own SBSM and SBSM-A. Brandon owns 45%, Rodney owns 45%, and Johnny

4

owns 10%. Rodney Steven is the president and secretary of SBSM, and Brandon Steven is the vice-president. Rodney Steven makes the decisions as to the hiring, firing, and other personnel decisions regarding the CEO.

Genesis Health Clubs Management, Inc. is a Kansas corporation with its principal places of business in Kansas. Genesis Health Clubs Management, LLC is a Kansas limited liability corporation, with its principal place of business in Kansas.

In August 2015, SBSM hired Violetta to serve as CEO of its minor league East Coast Hockey League franchises, the Wichita Thunder, the Tulsa Oilers, and the Allen Americans. Specifically, Rodney Steven made the decision to hire Violetta.

On August 19, 2015, SBSM and Violetta entered into a written two-year Employment Agreement. SBSM and Violetta entered into the Employment Agreement in Kansas, and Violetta performed at least some of his duties in the state. Rodney Steven negotiated and signed the Agreement on behalf of SBSM, and signed on behalf of the company.

The Employment Agreement does not identify SBSM-A, Brandon Steven, or Johnny Steven as parties to the contract.

During his many years in business, Rodney Steven has negotiated and entered into hundreds of business contracts, as well as three to five employment contracts.

The Contract provides for the payment of compensation to Violetta, including a base salary, potential bonuses, group medical and dental benefits, a car with insurance,

vacations, a cell phone and cell phone service, and reimbursement of relocation expenses of up to $20,000 and housing until he could locate and purchase a house.

The two-year term of the Agreement was subject to termination by either party upon 180 days written notice. Further, the Agreement provided that SBSM could terminate Violetta immediately for cause, which was defined as

i)   any act of personal dishonesty by Violetta in connection with his responsibilities as an employee;

ii)  Violetta's refusal or repeated failure in any material respect to perform his duties as CEO, after written notice to Violetta and a reasonable opportunity to cure;

iii) Any willful act by Violetta which constitutes gross misconduct and which in injurious to the Company.

Violetta was to receive a base salary of $150,000 in the first year of the Agreement, and $160,000 in the second, and was further authorized to draw $25,000 against his bonuses in the first year, and $20,000 in the second.

The Employment Agreement offered a series of bonuses for Violetta based on franchise performance. He would receive a $5,625 bonus if the combined corporate sponsorship revenues exceeded $2.25 million in a season, which ran from June to May. In addition, Violetta would also receive a $3,250 bonus if season ticket revenues exceeded $1.3 million, an additional bonus if group ticket sales exceeded specific monthly targets, and if the individual franchises met specified minimum net profits.

Rodney Steven drafted the bonus schedule attached to the Agreement, and also drafted and inserted the "for cause" termination provision.

The defendants do not have employee handbooks, personnel manuals, or any other personnel policies. They also do not have any policies or procedures, formal or informal, related to employee health benefits or COBRA. They did not keep a personnel file for Violetta, and do not have any documents reflecting communications to plaintiff regarding his eligibility or potential eligibility for any fringe benefit or to participate in any employee fringe benefit. The defendants did not keep copies of expense reimbursement records relating to Violetta, and do not have any documents related to their obligation to provide COBRA notice.

The defendant corporate entities (SBSM, SBSM-A, Genesis Health Clubs Management, Inc., and Genesis Health Clubs Management, LLC) do not keep minutes of their corporate meetings.

Citing an email by Rodney Steven, defendants contend that SBSM has an established policy of not paying for unused vacation days. However, the plaintiff counters that other evidence shows that SBSM had no established personnel policies. More importantly, plaintiff points out that the email was sent after this termination, and that no one ever told him of any such policy.

Rodney Steven has testified that Violetta's duties included implementing procedures for issuing ERISA and COBRA notices. Plaintiff disputes the contention, noting that the Employment Agreement makes no mention of such duties. Rather, his only duty was to notify Genesis whenever an employee left, so that Genesis could take care of any required notices.

7

During his employment by SBSM, plaintiff took $11,667.00 in payment as a draw against his bonuses.

Before Violetta was hired, all of the SBSM teams consistently lost money (except for the Thunder, which had made a small profit in 2012-2013). By August 2015, an officer for the Allen Americans wrote of the team's "desperate" situation. The team had numerous outstanding bills due, and Blue Cross had cancelled its health insurance for non-payment. To help the teams, Rodney Steven had transferred $1 million from Genesis.

Violetta reported to the SBSM corporate office in Wichita, Kansas, and was a satellite employee stationed in Allen, Texas, although he performed his duties under the contract in part in Kansas.

Violetta worked 80 hours a week, spending time in Allen, Tulsa, and Wichita. He devised strategies and worked to increase revenue, keeping Rodney Steven informed of what he was doing and getting his approval.

On December 23, 2015, Violetta emailed Rodney Steven an overview of his recommendations for making changes on staffing, compensation, and culture for the three teams, which he wanted to provide in more detail during an in-person meeting. These changes including replacing Matt Canavan in Allen and posting two new job descriptions he had prepared. Steven did not respond, so Violetta re-sent it on December 28.

Team finances improved under Violetta. Season ticket and corporate sponsorship revenue for the 2015-2016 were up about $739,000, or 44%, compared to the prior season.

8

By December 2015, all three franchises had significant increases in all major revenue streams, including corporate sponsorships, season tickets, and group sales. At the same time, the teams still had substantial prior debts. Rodney Steven wrote: "We have made some positive turns: Improved lease by $400k; Corporate sponsorship sales up $250k; Season ticket sales up; Group sales up."

During the 2015-2016 season, combined revenue for the three franchises was projected to be up almost $1.5 million, nearly a 50% increase, compared to the prior year.

On January 11, 2016, Rodney Steven stated, "[O]ur first year in Allen [2014-15] was ugly. This year looks tons better. … We are on a cash basis, so a lot of the bills we are paying this year are from last season. … [W]e are confident that next season we will show a profit."

Rodney Steven had originally wanted to hire Shawn Kuzmin as the CEO, and in March 2015, he had signed an Employment Agreement and sent it to Kuzmin with the statement, "I have signed my man." But Kuzmin was unable to accept the offer for family reasons.

In late May and early June 2015, while Steven was contemplating hiring Violetta, he continued to communicate with Kuzmin. Kuzmin said he was "aching" to take the job "but timing blows."

Steven responded, "Just move the family to Dallas and lets get it on."

Kuzmin replied, "June 2015 can't. June 2016 different story. Wish it were different. You know."

9

In late June 2015, Steven sent an email to Kuzmin saying, "Brandon and I still want you to come run our sports organization!"

Kuzmin responded, "Not saying no, but timing is my issue right now."

On December 6, 2015, Kuzmin emailed Brandon and Rodney Steven, asking, "Should we start negotiating the 2016 contract yet?" Rodney responded the same day, "Yes, we are still interested."

On January 10, 2016, Rodney Steven told Kuzmin that he and Brandon "are ready to go forward" with hiring Kuzmin. He sent Kuzmin the employment contract he had given him in 2015, and Kuzmin responded on February 2 that he was "definitely in" and would be ready to start in about a month or a month and a half.

After the Agreement, Violetta moved from New Jersey to Texas to work for SBSM. He listed his New Jersey house for sale, found a buyer in November of 2015, and entered into a contract to sell with a closing date on February 10, 2016. Violetta incurred over $77,000 in relocation expenses, such as packing and moving, personal travel, and house closing.

Violetta avers that he gave receipts for these expenses to SBSM, but it never reimbursed him. It is uncontroverted that SBSM did not did not reimburse him for any of these relocation expenses.  No one explained why Violetta was not reimbursed.[1]

---

[1] Defendants attempt to controvert the issue by relying on Rodney's testimony that "I do not recall him giving me expenses," but otherwise cites no evidence which would directly contradict Violetta's affirmative representation that he gave the materials to SBSM in February 2016 (except for the house closing costs). "A party opposing a properly supported motion for summary judgment cannot create a genuine factual

In September 2015, Violetta engaged a realtor to help him find a house in Texas. But he could not purchase a house in Texas until he sold his house in New Jersey, because he needed the equity. SBSM placed Violetta in a Sheraton hotel until he could purchase a house. Violetta has testified that he turned in his receipts for this temporary housing option every month, and SBSM reimbursed him for these temporary monthly housing expenses through November 30, 2015, in the amount of $4,950.00. However, SBSM did not pay for or provide reimbursement of Violetta's temporary housing expenses, or provide an alternative temporary housing option for him, after that date. In all, Violetta incurred $16,181 in additional temporary housing costs through September 30, 2016.

The parties dispute whether plaintiff was entitled to bonuses under the Agreement. Defendants have produced spreadsheets indicating that these targets were not met for the 2015-16 season. Further, defendants contend, the franchises lost money.

The plaintiff points out that the spreadsheets lack any foundation, and cites other evidence indicating that both targets were met. Plaintiff also contends he was entitled to a bonus for meeting a group ticket sales target. He states that he sent the figures

---

dispute simply by claiming that he does not recall a particular fact upon which the moving party has presented affirmative evidence." *Hatfield v. Occidental Chem. Corp.* 1988 WL 25249, *4 (4th Cir. 1988) (citing *Carter v. Newsday, Inc.*, 528 F.Supp. 1187, 1191 (E.D.N.Y.1981)); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735-36 (7th Cir. 2002) (plaintiff's testimony that she did not "recall seeing or reviewing" an arbitration brochure was insufficient to controvert affidavits indicating that "the brochure was definitely sent and presumably received" with plaintiff's paycheck).

supporting his bonus calculations to Rodney Steven in February of 2016, and Rodney did not dispute the figures.

Plaintiff also notes that Rodney Steven himself agreed when he was asked in his deposition whether the teams made "somewhere between 2.25 and 2.5 million." He later indicated that as to the corporate sponsorship, season tickets, and group tickets bonuses, the two former "I think … that I agree … but I'm not 100 percent."

Violetta received draws against his bonus in the amount $11,666, leaving a remaining balance of earned bonuses in the amount $17,209.

On February 17, 2016, Violetta sent an email to Rodney Steven concerning bonuses earned as of the date of the email.

Rodney Steven testified that on January 8, 9, or 10, 2016, he met with Violetta in person in Wichita with the intent of firing him on the spot. Steven told Violetta, "I just got to let you know what's going on here, this is not working out, Steve, and here's the following reasons why it's not working out." According to Steven's deposition, he told Violetta the teams were "losing money more and more," the "staff has no respect for him," he had been "sleeping in [the] office," and "has not hired staff to turn teams around." Steven testified that Violetta was passionate that he could fix things, so Steven reconsidered and orally told Violetta he would give him 30 days to see if he could "turn things around."

Plaintiff cites Steven's deposition testimony in support of his motion for summary judgment, while specifically disputing the truth of the allegations made in the meeting.

It is uncontroverted that in January, Rodney Steven did not provide Violetta with any sort of written notice relating to the potential termination of his employment.

There is an issue of fact as to *when* Violetta learned of a potential termination. Violetta contends that the first notice Rodney Steven gave of a possible termination was on March 3, 2016, when Rodney offered him the job as General Manager in Allen, and said that if that was unacceptable then March 11 should be his last day in the office. According to Rodney, he discussed termination with Violetta as early as January 9, 2016, and defendants note that on the next business day, Violetta began to look for new jobs, and research Texas law on wrongful discharge and termination, as well as "things that successful people do before leaving their job."

The issue is not material because it is otherwise uncontroverted that, even under defendants' version of the facts, Violetta was given additional time to improve his performance, but was then fired on February 11, "right now," with only 30 days notice. Plaintiff's employment terminated March 11, 2016.

Again, according to Steven, on February 11, he called Violetta and said, "Steve, I hate to do this on the phone right now and tell you, but this 30 days is not going to work, I'm terminating you effectively [sic] today. … [I]t's not working, Steve. You've lost all support from everybody who works for you."

Violetta said, "[Y]ou know, you owe me six months notice."

Steven responded, "[W]ell, your notice is starting right now. And – but I can't have you in the office anymore."

13

Violetta asked if he could help with the transition for the next 30 days since "you're going to be paying me anyway" because "you owe me six months notice."

Rodney Steven says he terminated Violetta for the reasons allegedly given in the January meeting.

SBSM terminated Violetta on March 11, 2016, and offered him the opportunity to serve as a General Manager or Ticket Manager for the Allen Franchise.

On March 3, Steven told Violetta that he was bringing in a new CEO, but offered him a job as General Manager of the Allen team, with a different compensation plan (lower salary and more incentives), because he knew he was "committed" and "can win in a lot of aspects."

March 11 was Violetta's last day of work, and the last day for which he was paid.

On March 13, 2016, Rodney Steven sent an email to persons outside the company stating that Violetta had been terminated for the reason that "goals were not being achieved" and that Kuzmin would be taking his place.

Violetta participated in group health plans for medical benefits and for dental benefits provided pursuant to his employment with SBSM.

Defendants contend that Violetta maintained health and dental coverage through the plan through June 30, 2016, citing a subsequent COBRA notice issued by SBSM. The plaintiff disputes this fact, citing evidence indicating that his healthcare benefits actually terminated along with his employment, and that Blue Cross Blue Shield cancelled his health insurance in May, once SBSM stopped paying premiums. Blue Cross would

14

subsequently deny health claims by plaintiff on the grounds that the policy had been terminated. Further, the Employment Health Plan precludes such a result, since it provides benefits only to full-time employees. In addition, Rodney Steven, testifying as a Rule 30(b)(6) witness, agreed that plaintiff's health benefits ended the last day of his employment (March 11, 2016).

On April 28, 2016, Violetta asked for plan documents from SBSM. On or about July 15, 2016, plaintiff suffered a foot injury for which he paid approximately $500 in medical bills.

SBSM did not send COBRA information to plaintiff until July 8, when it sent a document titled "Your Health Care Benefits Program," along with a COBRA Continuation Coverage Election Notice, as well as medical and dental benefits booklets. That document failed to identify, among other things, the plan name, plan number, or the plan's agent for service of process

It is uncontroverted that defendants failed to timely provide him with the requested plan documents. Defendants in their response (Dkt. 13 at 10) blame the failure on plaintiff himself, citing Rodney Steven's testimony asserting that Violetta was supposed to develop COBRA notice procedures. As noted earlier, Violetta disputes the asserted fact.

However, defendants' evidence is limited to the assertion that Violetta was supposedly tasked with developing COBRA procedures while he was employed. Defendants have supplied absolutely no evidence in support of the claim that any

15

supposed deficiency by plaintiff prevented or in their words "greatly contributed" to the delay.

On July 27, Violetta, through his lawyer, informed defendants that they had not provided Violetta with the information that met the requirements of a summary plan description under ERISA.

On August 30, 2016, SBSM provided plaintiff with a document titled "Additional Information Provided to Steven Brothers Sports Management of Allen LLC Medical Plan," which contains legally required information about the plan. According to the metadata in its "properties," this document was created on August 19, 2016. The Additional Information provided information that was inconsistent with the July 8 notice about things such as the plan name, the insurance provider, and who to pay and where to send payment for continuation coverage.

After Violetta filed his Complaint, Rodney Steven directed Genesis employees, including LaNisha Rose, the Genesis Health Clubs Human Resources Manager, using a "genesishealthclubs" email domain, to handle Violetta's COBRA and plan document inquiries. Defendants' privilege log further demonstrates that Genesis was heavily involved in responding to Violetta's requests for information and ERISA plan benefits and COBRA continuation coverage.

The same day that defendants gave Violetta a COBRA Continuation Coverage Election Notice (July 8, 2016) SBSM served Violetta with a summons notifying him that it

had sued him, seeking a declaratory judgment that it did not owe him for pay for the 180-day notice period.

The COBRA Election Notice further stated: "You're getting this notice because your coverage under the Plan will end on 6/30/2016 due to … End of employment." As noted earlier, SBSM had actually ended Violetta's employment on March 11, and Blue Cross Blue Shield had informed Violetta his coverage had ended.

The COBRA Notice states that coverage would be under the Top Shelf LLC plan. Top Shelf LLC was the company from whom the Steven Brothers had bought the Allen Americans a couple of years earlier. The Notice stated that payments for continuation coverage should be made to Blue Cross and Blue Shield of Kansas and sent to a PO Box in Dallas. But the benefits book provided to him the same day referred to Blue Cross and Blue Shield of Texas.

On July 27, Violetta, through his lawyer, highlighted for defendants the problems and inconsistencies with the COBRA notice.

On August 30, Violetta completed and sent the COBRA Continuation Coverage Election Form to the designated contact, Joel Lomurno, who is employed by SBSM, at the designated address in Wichita.

On September 3, Violetta sent an email to Lomurno, who was listed as the contact to answer questions, asking when, where, and how to make the payments for COBRA benefits. Violetta also reported that he had incurred medical services in July that should have been, but were not, covered by insurance.

On September 4, Lomurno responded, "As for your questions I have no idea on any of this so will probably have to check with lanisha in HR." LaNisha Rose is employed by Genesis as its HR director.

On September 26, Rose instructed that payment for COBRA coverage should be made to "Allen Americans" and mailed to an address in Allen, Texas. This contradicted the instruction in the COBRA Notice that payment should be made to "Blue Cross Blue Shield of Kansas" and mailed to a Dallas address.

On September 29, Violetta's counsel wrote a letter to defendants' counsel to try to help facilitate Violetta's COBRA coverage in light of the inconsistent information that had been provided over several months. On October 8, Violetta timely tendered payment for COBRA coverage in the manner LaNisha Rose had instructed him.

Violetta and his counsel aver that they did not file or litigate his ADEA claim in bad faith, vexatiously, wantonly, for oppressive reasons, or for any other improper reasons.

The Steven Brothers own multiple companies, and plaintiff claims they freely intermingle assets. He notes one document indicating that the hockey teams "sucked cash," so that Genesis had to put $1 million into them through operations in 2015. In another instance, SBSM devised what it described as a "shady" scheme, to get around a League requirement to use an approved vendor to purchase dashers, logos, and signage for the hockey teams, to "have a local trade deal and Genesis pays our bill. . . . Obviously though we would have to make sure there was no trail of a money transfer in case we get

18

audited." Rodney Steven approved the plan, stating, "Just make sure you don't get in trouble."

In addition, Rodney Steven gave cars from a car dealership he operates with Brandon Steven to the coach of the hockey team with "no terms," travel expenses for Genesis employees were paid for using hockey team credit cards, Genesis human resources took care of SBSM health care benefit issues.

Defendants do not controvert these specifics, only arguing that plaintiff had not properly pled piercing, and that there is no showing of fraud or injustice.

**Conclusions of Law**

The court finds that plaintiff has demonstrated a breach of the Agreement, and that he is entitled to compensation for his relocation expenses, housing costs, earned bonuses, and salary lost by the early termination of the Agreement.

With respect to these claims, defendants argue that the documents submitted by Violetta fail to support any recovery because he only submitted invoices rather than evidence of what he actually paid out. According to defendants, Violetta's documentation only indicated that he was out-of-pocket $580.88. Finally, defendants offer a construction of the moving expenses clause under which plaintiff would only be entitled to "travel events" — that is, apparently, the cost of travelling to a closing, but not the closing cost itself. (Dkt. 133, at 16).

The court finds that plaintiff is entitled to $20,000 in moving expenses. There is no question that Violetta incurred expenses substantially in excess of the $20,000 allotment for moving expenses, and the agreement (drafted by defendant Steven) is not reasonably construed to preclude recovery. There is no evidence that the charges presented by Violetta were otherwise exorbitant or unreasonable.

The moving expenses clause provides:

MOVING EXPENSES - Violetta will be provided a $20,000 (net) relocation fund, to be used for reimbursement of relocation expenses, [i]ncluding but not limited to: packing and moving of household goods, personal travel to/from Texas for trips such as packing day, house closing, etc. Violetta will provide receipts on a timely basis and will be reimbursed up to $20,000 for his moving expenses. The parties will cooperate to maximize tax-free reimbursement of moving expenses.

In addition [sic] Company offers a monthly housing option for Violetta until a house to purchase is located. This option will be via trade through the Allen Americans.

There is no evidence that Violetta was not legally obliged to repay the charges presented in the relevant invoices. Although the agreement includes travel expenses, it is explicitly not limited to them, and the key clause is the provision of a "relocation fund" which is designed to reimburse Violetta for his "relocation expenses." Relocation expenses is a term broader than mere travel costs, and the inclusion of a "housing option" confirms the view that the clause is dealing with something more than travel alone.

Violetta also seeks recovery for $16,181 in housing expenses for costs incurred through September 30, 2016. Defendants dispute the claim, stressing that plaintiff's

declaration submitted in conjunction with this motion for summary judgment was unsworn, and plaintiff failed to submit any supporting receipts.

The court finds that plaintiff is entitled to this housing expenses claim. The evidence supports the finding that plaintiff incurred these expenses for rooming at the Sheraton, and there is no evidence by defendants showing the expenses were false or unreasonable. To the contrary, the evidence shows that SBSM paid for the Sheraton expenses, without complaint, until it discharged plaintiff.

The court also finds that plaintiff is entitled to $17,209 in unpaid bonus compensation. The uncontroverted facts set forth earlier indicate that plaintiff earned this amount in addition to the $11,667 draw he received on anticipated bonuses. The conclusion is supported both by plaintiff's testimony, and that of Rodney Steven, who agreed that the corporate sponsorship amount was "somewhere between 2.25 and 2.5 million." In the court's view, this warranted a bonus under the Agreement, which expressly provided for bonuses "based on the combined revenues in that particular stream among The Franchises."

Plaintiff also seeks $82,608.06 in additional salary, based on his termination, which he contends violated the Agreement's provision for termination by 180 days written notice. Defendants argue that they are not liable for any additional pay because SBSM properly terminated Violetta for cause pursuant to §3(D)(ii).

The cited provision allowed for immediate termination in the event of "Violetta's refusal or repeated failure in any material respect to perform his duties as CEO,"

provided that SBSM gave plaintiff "written notice … and a reasonable opportunity to cure." Defendants argue that Violetta materially failed in his CEO duties, which they allege included an obligation to improve the teams' profitability. Defendants further argue that the company's emails to Violetta should be deemed to constitute the written notice required by § 3(d)(ii), or in the alternative that the oral warnings to Violetta should be deemed to constitute substantial performance under Texas law.

Plaintiff argues that the belated invocation of § 3(D)(ii) is a post-hoc rationalization for SBSM's breach of the contract, and stresses (Dkt. 145, at 18) that SBSM did not invoke the "for cause" provision in 2016. Rather, after Rodney Steven orally complained to plaintiff, and plaintiff reminded him of the 180-day notice provision, Steven simply responded, "well, your notice is starting right now." Steven did not indicate that he was invoking the right to immediate termination under § 3(D)(ii).

Further, plaintiff argues that the concerns cited by Steven, such as losing money, are insufficient to trigger application of § 3(D)(ii), which is reserved for a complete failure or refusal to do the work of CEO.

The court finds that plaintiff is entitled to summary judgment on unpaid salary. Defendants' interpretation of the "duties" contemplated § 3(D)(ii) — that they included, for example, the fielding of profitable teams, might be reasonable if viewed purely in isolation from the rest of the Agreement and the circumstances of the parties. The SBSM franchises had been historically losing money. Section 3(D)(ii) calls for a "reasonable opportunity to cure," which implies that the underlying default must be something

which can be corrected more readily that a hockey team's profitability (for which SBSM gave Violetta only a month to "cure").

More importantly, interpreting the specific "just cause" provision so broadly that it incorporates everything from increased profitability to nebulous concepts like increasing "respect" from subordinates has the effect of nullifying the Agreement's general provision of termination only upon 180-days notice. It has the effect of making the exception swallow the general rule. This construction is further appropriate given the fact that the Agreement was drafted by Rodney Steven on behalf of SBSM.[2]

The court finds that only SBSM is liable to plaintiff on the breach of contract claims. Defendants presented evidence that SBSM was the only defendant which was a party to the Agreement, and accordingly only it can be liable of the breach. *See City of Andover v. Southwestern Bell Telephone, L.P.*, 37 Kan.App.2d 358, 362 (2007).

Plaintiff argues that the remaining defendants are also subject to liability under the doctrine of piercing the corporate veil. *See Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 796-97, 473 P.2d 33 (1970); *University of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1239 (D. Kan. 2008).

_____

[2] Because the court finds that plaintiff was entitled to 180-days notice under the uncontroverted facts, it need not resolve the additional claims advanced by defendants as part of their Section 3(D)(ii) argument — that their emails should be deemed the required written notice or that the oral communications reflected substantial performance. Plaintiff notes substantial Texas authority indicating that in similar circumstances, where a contract calls for written notice, oral notice is insufficient. *See, e.g., Emerald Forest Util. Dist. v. Simonsen Constr.*, 679 S.W.2d 51, 54 (Tex. App. 1984).

The court declines to impose such liability for two reasons. First, the present attempt to claim liability under a corporate veil is barred by the history of the action. Such a claim is an equitable remedy which must be adequately pled, yet the Pretrial Order entered in the action makes no mention of the issue. To the contrary, with respect to the contract claim, the Pretrial Order makes no allegation of the factors supporting such an equitable remedy.

Second, even if the claim were properly before the court, application of the doctrine is not justified under the facts of the case. At most plaintiff has shown some informality among the defendants' family-held businesses, but there is not indication of fraud or other unfairness to plaintiff in respecting the corporate structure of defendants. Piercing the corporate veil requires both a disrespect of the separate identity of a corporation, and a resulting fraud or injustice relating to plaintiff. *See NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993).

Here, plaintiff has failed to show that SBSM cannot compensate him for the recovery to which he is entitled, and has failed to show that in any way he was misled as to the defendants' corporate structure. Based on the evidence in the record, the court grants summary judgment to defendants, other than SBSM, as to plaintiff's contract claims.

With respect to plaintiff's ERISA and COBRA failure-to-notify claims, defendants argue in their motion that the court should determine that (1) only SBSM-A, as the plan administrator, is liable for any statutory penalties for a failure to provide required notices

and information, (2) that no penalties may be awarded because plaintiff himself contributed to any delays, (3) that no penalties should be awarded given an absence of bad faith or actionable damages by Violetta, and (4) any attorney fees should be limited to the reasonable expenses of obtaining the required notices. Plaintiff argues in his motion that the court should award penalties under COBRA and ERISA for the failure to provide timely notices. Plaintiff argues that such penalties should be awarded against all defendants as part of the "control group" which included his employer SBSM, citing *Law v. Ernst & Young*, 956 F.2d 364 (1st Cir. 1992) and *Carner v. MGS-576 5th Ave., Inc.*, 992 F. Supp. 340, 358 (S.D.N.Y. 1998).

The court finds that, were it to award penalties, they would be assessed against SBSM-A only, as that company has been designated the plan administrator. *Ernst & Young*, cited by plaintiff, is distinguishable. In that case, the court held that Ernst & Young, the successor of the defunct Arthur Young accounting firm, could be held liable as plan administrator, even though an internal Arthur Young committee had been the formally-designated administrator. The court cited "the plethora of evidence indicating that Arthur Young had assumed and controlled the plan administrator's function." 956 F.2d at 372. Moreover, the court expressed concern that a contrary rule, under the circumstances of the case, could unfairly preclude any recovery *Id*. at 373 "If a company ignored in practice any distinction between the administrator and itself, and assumed responsibility for responding to plan inquiries (as Arthur Young appears to have done here), both it and the purported plan administrator would be immune from liability."

*Carner v. MGS-576 5th Ave., Inc.*, 992 F. Supp. 340, 358 (S.D.N.Y. 1998) is similarly distinguishable. In that case, counsel for the defendant corporations both "conceded that the Plan failed to designate a Plan administrator" and indeed "that defendants (and not Blue Cross) were the Plan's administrator." The court recognized that where no administrator is designated under a plan, the plan sponsor (the employer) is responsible for complying with COBRA. *See* 29 U.S.C. § 1002(16)(A).

There is no similar concession here. There is no evidence that Violetta was employed by any defendant entity, no evidence that any other entity assumed control of the COBRA and ERISA obligations, and no evidence that the administrator is insolvent or otherwise unable to pay any penalty.

The court denies summary judgment as to defendants' claim that no penalties should be awarded because plaintiff contributed to the delays involved. First, there is a factual dispute as to whether Violetta was actually responsible for developing COBRA and ERISA procedures. Second, the statutory provision cited by defendants, 29 U.S.C. § 1132(c)(1) simply provides that penalties may be limited where a lack of notice was due to "matters reasonably beyond the control of the administrator." Even assuming for the sake of argument that Violetta had been tasked with developing notice procedures and thus "contributed to" the delay in sending notice (Dkt. 128, at 12), this does not mean that it was reasonably beyond SBSM-A's control to realize, promptly, that no proper procedures were in place and provide the required notice.

Nonetheless, the court finds that no penalties should be awarded given all the circumstances of the case, including the relatively brief nature of the delay, the absence of evidence of bad faith on the part of defendants, and extremely limited evidence of actual prejudice cited by plaintiff. Plaintiff notes that an absence of bad faith or lack of prejudice does not "exonerate[]" a defendant. *See Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1494 (11th Cir. 1993). At the same time, both remain highly relevant factors for the court to employ in exercising its discretion whether to award statutory penalties.

Finally, the court agrees that plaintiff's recovery for attorney fees under 29 U.S.C. § 1132(g)(1) is limited to the efforts reasonably expended in obtaining the required notices in 2016.

Plaintiff argues that the defendants' motion is "premature" and "misplaced at the summary judgment stage." (Dkt. 141, at 17). He also argues that the request "ignores other considerations, including culpability and the deterrence value of attorneys' fees." (Id.). Plaintiff supplies no authority for the argument that the court cannot award partial summary judgment on the issue, and no evidence to support any claims of particular culpability or required deterrence.

In particular, the court notes that plaintiff provides no response to the concerns expressed in cases noted by defendants, such as *Bos v. Bd. of Trustees*, 818 F.3d 486, 493 (9th Cir. 2016), which have specifically cautioned against an expansive reading of § 1132(g)(1), or even articulating how an award of fees is appropriate in light of the factors set forth in *Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 13836 (10th Cir. 1997).

27

The court finds plaintiff has failed to demonstrate evidence of bad faith or enhanced culpability or any substantial value for deterrence. There is no evidence that the benefit from an award of fees will inure to any party other than Violetta and his counsel. As noted earlier, delay did occur but it was relatively limited, and plaintiff has failed to show that his out-of-pocket medical expenses exceeded the cost of additional premiums for continued coverage.

Defendants are entitled to summary judgment as to plaintiff's claims of breach of fiduciary duty under 29 U.S.C. § 1132(a)(2) and (3). The former provides actions against plan fiduciaries where the claim is brought to provide recovery "to such plan." Notwithstanding plaintiff's testimony presented as a correction to his deposition that he is also bringing his claim "on behalf of the plan," the fact remains that in the Pretrial Order (Dkt. 121), which controls the course of the litigation, advances claims only for his own monetary benefit.[3] Accordingly, defendants are entitled to summary judgment on the issue.

The same result holds true for plaintiff's claim under § 1132(a)(3), which only provides for equitable relief. Plaintiff notes that in certain circumstances, monetary awards may be made under this section, citing *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011). The court awarded damages in that case, however, under circumstances markedly different from the present case. There, the plan's decision to change its structure resulted

---

[3] The Amended Complaint also advances no claim on behalf of the plan. (Dkt. 86, ¶ 52).

in halving the vested annuity which some plaintiffs expected to receive. Under these circumstances, the court construed monetary payments as "'compensation' for loss resulting from a trustee's breach of duty." 563 U.S. at 441-2. The required payments had the equitable effect of restoring plaintiffs to their prior position.

The present case presents no such denial of vested ERISA annuities, and any award of monetary damages under § 1132(a)(3) would in direct conflict with the language of the statute.

Defendants argue that the court should dismiss plaintiff's claims arising under the KWPA because: (1) plaintiff's claim for unpaid salary after his termination is not a claim for "wages" within the meaning of the KWPA, (2) unused vacation pay is recoverable only if the employer had a policy of paying out such benefits, (3) any recovery for unpaid bonuses or other compensation is barred because defendants' actions were not willful, and (4) only SBSM is subject to liability under the statute. (Dkt. 128 at 21-26). Plaintiff indicates that he is not seeking vacation pay as part of his KWPA claim, but otherwise argues that all of the cited wages and benefits are compensable under the KWPA, and, citing *Benjamin v. Manpower, Inc. of Wichita*, 3 Kan.App.2d 657, 600 P.2d 148 (1979), argues that defendants' violation of the statute was willful. (Dkt. 141 at 11-13).

The court grants summary judgment as to plaintiff's claim that defendants failed to provide 180 days notice, under which he seeks recovery for the remainder of his unpaid salary. Under the KWPA, "wages" means "compensation for labor or services rendered by an employee." Here, plaintiff never rendered services for the unpaid salary,

his claim is prospective only, and premised on services that were yet to be performed. Violetta cites no authority for treating unpaid future salary as earned "wages" within the meaning of the statute, and defendants are entitled to summary judgment on the issue.

The court finds that a material issue of fact precludes any award of summary judgment as to the remaining unpaid benefits. Defendants correctly note that under Kansas law, willfulness means acting with "a design, purpose, or intent on the part of a person to do wrong or to cause an injury to another," *A.O. Smith Corp. v. Kansas Dep't of Human Resources*, 36 Kan.App.2d 530, 543 (2005), and that the KWPA penalty will not be imposed where the employer does not act willfully, but as the result of an "'honest dispute' …. over the amount of wages due." *Coma Corp. v. Kansas Dep't of Labor*, 283 Kan. 625, 646 (2007). Defendants argue that Violetta was terminated only after repeated warnings and encouragements for better performance.

The court finds that *Benjamin*, relied upon by e defendants, does not compel the determination that the nonpayment of compensation was willful. That case in fact stressed "[t]he general rule … that the determination of a knowing and willful failure to pay wages is a matter that is properly left to the finder of fact." 3 Kan. App. 2d at 658; 600 P.2d at 150.  The court's determination that defendant had willfully failed to pay earned vacation benefits was closely tied to the evidence in that case, which showed that "the contract term had passed without the employer complaining to the worker about the quantity or quality of his work." *Id*. at 661; 600 P.2d at 151. The "honest dispute" defense should not be allowed, the court concluded, because "an employer [should not] be

permitted to reexamine whether or not an employee's work was 'satisfactory' after wages (vacation pay) have been earned and the employee has been terminated." *Id*. at 661; 600 P.2d at 152.

Here, there is evidence that defendants vigorously complained of Violetta's performance prior to his termination. As discussed earlier, the court concludes that based on the evidence in the record, plaintiff is entitled to recover his unpaid bonuses and other compensation under the Agreement. But the matter may not have been so clear to defendants in 2016, and given all of the evidence in the case and the preference for resolution of the issue by the trier of fact, the court will not resolve the issue by summary judgment.

The court will not award summary judgment in favor of the individual defendants. Under K.S.A. 44-323(b), an owner of a company may be subject to the statute's penalties if the owner "has charge of the affairs of the employer" and "knowingly permits the employer" to violate the KWPA.

With respect to individual defendants Brandon and Johnny Steven, both parties stress (Dkt. 141 at 14; Dkt. 144 at 11) that the other side has failed to introduce evidence as to their participation in the management of SBSM and Violetta's termination. Both parties are correct — there is simply no evidence before the court as to these defendants.

But the underlying motion is defendants' summary judgment motion, where the statement of facts mentions Brandon and Johnny Steven only to indicate that they live in Kansas and own SBSM, but were not parties to the Agreement with plaintiff. The

31

memorandum fails to provide any evidence that Brandon and Johnny Steven were not involved in SBSM's management, or what they may have known of the company's relationship with Violetta. Because defendants have not proven these individuals have no responsibility for any KWPA violation, the motion for summary judgment is denied.

Defendants acknowledge that the issue of liability as to Rodney Steven is "a closer question," (Dkt. 144, at 11) but argues that summary judgment is appropriate because Rodney did not knowingly violate plaintiff's KWPA rights. As with the other individual defendants, the court will deny summary judgment. There is substantial evidence that Rodney was keen to hire another manager for the Franchises, and Violetta disputes the validity of the complaints raised against him.

Finally, defendants have moved for an award of attorney fees for their expenses in responding to Violetta's age discrimination complaint. "When a defendant is the prevailing party on a civil rights claim … district courts may award attorney's fees if the plaintiff's 'claim was frivolous, unreasonable, or groundless,' or if 'the plaintiff continued to litigate after it clearly became so.'" *CRST Van Expedited, Inc. v. E.E.O.C.*, 136 S. Ct. 1642, 1646, 194 L. Ed. 2d 707 (2016) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)).

> "Without foundation" is nebulous and begets the very post hoc fallacy the Court warned against. *See* [*Christianburg*,] at 421-22 ("[I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation."). But "frivolous" and "unreasonable" are both terms of art in the law. "Frivolous" means "[l]acking a legal basis or legal merit; not serious; not

> reasonably purposeful." BLACK'S LAW DICTIONARY 692 (8th ed. 1999).
> "Unreasonable" means "[n]ot guided by reason; irrational or capricious."
> *Id.* at 1574. "Courts should therefore ask whether the action was irrational,
> capricious, not guided by reason, not serious, or not reasonably
> purposeful." *Watson v. Cty. of Yavapai*, 240 F. Supp. 3d 996, 1000 (D. Ariz.
> 2017).

*Martinez v. Maricopa County Com. Col.*, 2018 WL 2119338, *2 (D. Ariz. May 8, 2018).

Defendants stress, first, that the claim was withdrawn only at the last minute, just before the Pretrial Order, after defendants had expended substantial effort in preparing to defend the claim. Second, the plaintiff did not undertake any substantial effort to obtain discovery as to the issue. Third, defendants argue that the circumstances of the case — Violetta was hired when he was 56 years old fired six months later — mean that the claim "defied all common sense." (Dkt. 128, at 27). In support of the last point, defendants note the Seventh Circuit's observation in *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361-62 (7th Cir. 2001):

> [I]t is eminently reasonable to doubt that, as in this case, a worker hired at
> an age well beyond that at which the protections of the age discrimination
> law click in and terminated within months, that is, before he is appreciably
> older, was a victim of age discrimination. A company that didn't want 54-
> year-olds on its payroll would be unlikely to hire one rather than to hire
> one and promptly fire him, thus inviting a lawsuit because terminated
> workers are much more likely to sue than ones who have merely not been
> hired, because of the greater difficulty of proving damages in the latter case.

Plaintiff opposes the motion for summary judgment, citing both his and his counsel's affidavits that state, in purely conclusory fashion, that ADEA claim was not made in bad faith. Plaintiff neither mentions *Kadas* nor responds to defendants' point about the lack of discovery on the issue. He does contend that a claim of age

discrimination would have been supported by the ultimate hiring of Kuzmin, and claim that evidence at trial would have shown that many of the concerns raised by Rodney Steven were false and pretextual. Finally, they argue that the issue is precluded by the February 5, 2018 agreed order dismissing claims, under which each party would bear their own costs.

The court finds the issue is properly before the court and not waived, as the Pretrial Order specifically notes that defendants were reserving the issue. (Dkt. 121, at 9). The conclusory affidavits offered by Violetta and counsel do little to resolve the issue, since defendants' right to fees turns on an objective assessment of the age discrimination claim. Fees may be awarded for advancing a frivolous claim, "even though not brought in subjective bad faith." *Christianburg*, 434 U.S. at 421.

The issue is close, and the court is particularly troubled where plaintiff placed so little effort into documenting an inherently suspect claim. Nonetheless, the burden for awarding fees is high, and the court in its discretion finds that defendants have not demonstrated they are entitled to fees under the circumstances of the case.

In summary the court grants summary judgment in favor of plaintiff as to his claims of breach of contract for unpaid travel expenses, housing costs, bonuses, and the unpaid salary he would have earned if properly terminated with 180 days notice against SBSM. The court grants summary judgment in favor of the remaining defendants on these claims. The court finds that a material issue of fact exists whether unused vacation benefits are recoverable as a part of plaintiff's claim for breach of contract. Neither party

has submitted evidence showing that such benefits were customarily paid, or were customarily not paid. In the absence of such evidence, let alone evidence resolving the matter beyond a reasonable doubt, the court declines to resolve the matter by summary judgment.

The court denies plaintiff's claims for breach of fiduciary duty under ERISA, and his claims for civil penalties based on improper notice under ERISA and COBRA. The court grants judgment in plaintiff's favor as to his actual damages for lack of notice against SBSM-A; such claims against the remaining defendants are dismissed. The court will authorize an award of reasonable attorneys' fees for work expended on obtaining the required notices; such claim for fees is otherwise denied.

The court denies plaintiff's KWPA claims to the extent it is premised on unpaid salary. With respect to the remaining claims, the court finds that a material issue of fact exists with respect to the willfulness of the alleged violation, and the participation in the action by the individual defendants.

The court denies defendants' motion for attorneys' fees in defending the ADEA claim.

IT IS ACCODINGLY ORDERED this 31st day of May, 2018 that the defendants' Motion to Strike (Dkt. 147) is denied; the plaintiff's and defendants' Motions for

Summary Judgment (Dkts. 127, 129) are granted in part and denied in part as provided herein.

_J. Thomas Marten_
J. THOMAS MARTEN, JUDGE